In the Matter of the Application of HAWAIIAN TELEPHONE COMPANY For Approval of Intrastate Rate Increases and Revised Rate Schedules

NO. 9343

(DOCKET NO. 4306)

SEPTEMBER 27, 1984

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

We are asked to review a decision and order of the Public Utilities Commission allowing a rate increase for telephone and related services provided by the Hawaiian Telephone Company. The Company sought specific approval of revised intrastate rate schedules it claimed were projected to increase intrastate revenues by approximately $47,600,000 and "produce [an] 8.6% rate of return on the average intrastate rate base for the test year 1982." After lengthy contested proceedings, the Commission approved instead rate schedules it found would increase revenues by $27,121,000 and produce a 9.18% rate of return. The Company appeals, charging the Commission erred: (1) "in failing to find a fair rate of return," (2) "in failing to provide the Company an opportunity to earn a fair return on its intrastate rate base," (3) "by making an unsupported and unlawful 'Separation Adjustment,'" and (4) "in awarding a rate increase sufficient only to produce an annual revenue increase of $27,121,000." Finding no merit in the claims of error, we affirm the decision and order.

I.

A.

After filing the required notice of an intent to seek rate increases in early June of 1981, Hawaiian Telephone submitted an application for approval of revised rate schedules in August of

1981. The revised schedules, it claimed, were structured to generate increased intrastate revenues of $47,600,000, which in its estimation "represent[ed] a 25% increase."

The application came on the heels of the approval in June of 1981 by the Federal Communications Commission (FCC) of a 1980 agreement between American Telephone and Telegraph Company (AT&T) and Hawaiian Telephone purporting to represent a "resolution among the various interests involved of questions of jurisdictional separations, settlements, and rate integration for Hawaii."[1] The agreement was spurred by the federal agency's determination in 1972 that rates for interstate telecommunications services to and from Hawaii, which then were substantially higher than interstate rates on the mainland, should be integrated into the "U.S. Mainland domestic rate pattern" and the agency's 1976 decisions that this was to be achieved in three phases and accompanied by "cost-based settlements based on prescribed jurisdictional separations procedures."[2]

The ordered integration was partially implemented by rate

---

[1] The foregoing language is from the joint motion submitted to the FCC by AT&T and Hawaiian Telephone. The agreement itself stated it was "for revenue division (settlement) arrangements for interstate MTS [message telecommunications services] and WATS [wide area telecommunications services] to and from Hawaii."

[2] The first of the agreement's recital clauses reads as follows:

WHEREAS, the Federal Communications Commission (FCC) has determined the public interest requires that interstate MTS and WATS rates for service to and from Hawaii be integrated into the U.S. Mainland domestic rate pattern, *Establishment of Domestic Communications-Satellite Facilities,* 35 F.C.C.2d 844 (1972); that such rate integration should be accomplished by phased reductions in three steps, *Integration of Rates and Services,* 61 F.C.C.2d 380 (1976); and that such rate integration should be accompanied by cost-based settlements based on prescribed jurisdictional separations procedures, *Integration of Rates and Services,* 61 F.C.C.2d 380 (1976), *Reconsideration,* 65 F.C.C.2d 324 (1977), *Memorandum Opinion and Order,* FCC 78-693, released September 29, 1978[.]

"Jurisdictional separations procedures" are methods by which the costs of providing services, expenses, and revenues are allocated between the federal and state jurisdictions. As a publication of the National Association of Regulatory Utility Commissioners (NARUC) explains:

Telephone Companies are engaged in furnishing both intrastate and interstate communications services, including exchange, message toll telephone, wide area telephone, private line, and data services. The intrastate services are subject to the jurisdiction of the several state regulatory bodies, and interstate services are subject to the jurisdiction of the Federal Communications Commission. The

reductions in 1976, 1977, and 1979. Full integration, however, was to come after the prescription of procedures to be applied in determining "jurisdictional separations and cost-based settlements" with respect to Hawaii. Thus, a Federal-State Joint Board was convened by the FCC to examine existing procedures for possible modification to suit the situation. But before the Board submitted its recommendation, AT&T and Hawaiian Telephone agreed they would request the Board to recommend and the FCC to decree that the method of separations described in the NARUC-FCC Separations Manual (Feb. 1971 ed.), which has been incorporated in the FCC's rules, would apply.

The compact between the interstate and the intrastate carriers stipulated they would jointly seek sanction to delay full implementation of these procedures and full rate integration until 1985. The agreement also provided that cost-based settlements were to be effective from 1981 through 1984, but the local carrier was to receive "transitional supplements" during this period.[3] The

major portion of telephone property of the companies is used in common for both intrastate and interstate services. Similarly, the major portion of the expense is incurred in the joint rendition of these services. Therefore, a uniform method of separations, acceptable to the state and federal regulatory bodies, is essential so that the property costs, revenues, expenses, taxes and reserves of each company subject to the respective jurisdictions may be determined.
NARUC-FCC Cooperative Committee on Communications, Separations Manual 5 (1971).

[3] The agreement provided in relevant part:

(2) For 1981 through 1984, the interim MTS and WATS settlement will consist of a uniform cost-based settlement, plus a transitional supplement.

(A) The uniform cost-based MTS and WATS settlement will be based on Hawaiian interstate MTS and WATS costs determined in accordance with the existing Separations Manual or any revisions thereto prescribed by the FCC or other authorized body, and will include the uniform interstate settlement ratio. Such settlement, including underlying separations studies, and procedures for subsequent review and true-up, will be administered in accordance with procedures employed by telephone companies on the Mainland.

(B) The transitional supplement will be based on a decreasing percentage of the cumulative total revenue growth from January 1, 1980 (over 1979) in actual two-way Hawaii interstate MTS and WATS revenues, as follows:

| Year | Percent |
|------|---------|
| 1981 | 100 |
| 1982 | 60 |
| 1983 | 35 |
| 1984 | 20 |

agreement called for parity thereafter in rates for telecommunications services to and from Hawaii and interstate rates on the mainland United States.

In accord therewith AT&T and Hawaiian Telephone moved in July of 1980 to have the Joint Board recommend the prescription of the NARUC-FCC Separations Manual for Hawaii and to have the FCC approve the agreement, asserting such actions would "avoid the need for further proceedings . . . and . . . result in implementation of full rate integration in a manner that will serve the overall public interest." Hawaiian Telephone sought the support of Hawaii's Congressional delegation and the Governor in seeking such approval. But before endorsing the carriers' pact, the Governor requested an explanation on how it would be of direct benefit to customers.[4] In responding to the pointed query, Hawaiian Telephone professed that the agreement provided a means to accomplish rate integration with minimum impact to Hawaii customers and "the accumulated cost to Hawaii and Mainland customers of delaying integration [would] be approximately $36 million compared to the $130 million in transition payments *which lessen the need for local rate increases.*" (Emphasis supplied).[5] Similar representations were made in a subsequent letter from a company vice-president to the Attorney General.[6] A formal expression of

---

[4] Since Hawaiian Telephone's position before the State PUC has been that "the Company's interstate services are separate and distinct from its intrastate services, at least for rate-making purposes," the Governor sought clarification on "precisely how the users of the Company's intrastate services will directly benefit from the operation of the . . . Agreement." *See* letter from the Hon. George R. Ariyoshi to Donald M. Kuyper, President, Hawaiian Telephone Company (July 31, 1980).

[5] *See* letter from Donald M. Kuyper to the Hon. George R. Ariyoshi (Aug. 13, 1980).

[6] The letter from L. K. Toole to Attorney General Tany Hong dated October 15, 1980 stated in part:

As indicated in recent correspondence between Mr. Don Kuyper and Governor George Ariyoshi, '[w]e are obliged as a business matter to maintain an adequate overall rate of return for the Company as a whole.' The Agreement between Hawaiian and AT&T significantly lessens the need to increase local rates to fully allowable levels in order to maintain that comparable overall rate of return.

It is our intent to certainly give consideration to the level of comparable overall earnings in determining the amount and timing of any application for local rate relief.

State support was transmitted thereafter to the chairman of the FCC.[7] The federal regulatory agency "accepted and approved" the agreement in July of 1981.

### B.

Hawaiian Telephone submitted its application for intrastate rate increases to the Public Utilities Commission on August 25, 1981. In accord with the mandate of Rule 8-3 of the Commission's Rules of Practice and Procedure, the petition was accompanied by "written direct testimony" and exhibits purportedly sustaining the requested rate increase.

The Consumer Advocate of the State of Hawaii, whose duty it is to "represent, protect, and advance the interests of consumers of utility services,"[8] however, considered the submission wanting in essential respects and quickly moved for summary disposition of the application. He argued the testimony and exhibits neither established "cost justifications" nor reflected the Company's "earn-

---

[7] The Governor's letter to the chairman of the FCC stated in part:

In a filing to the FCC in September, the State of Hawaii expressed its support of this agreement with certain qualifications. I am pleased to be able to inform you that those concerns have now been resolved in a manner that is satisfactory to all parties, and that local users of telephone services in Hawaii will benefit from the agreement.

Therefore, I urge the Joint Board and the Commission to approve the agreement between Hawaiian and AT&T as expeditiously as possible. I am confident that such action is in the best interest of the citizens of the State of Hawaii.

Letter from the Hon. George R. Ariyoshi to the Hon. Charles D. Farris (October 16, 1980).

[8] HRS § 269-51 provides:

Consumer advocate; director of commerce and consumer affairs. The director of commerce and consumer affairs shall be the consumer advocate in hearings before the public utilities commission. The consumer advocate shall represent, protect, and advance the interest of consumers of utility services. The consumer advocate shall not receive any salary in addition to the salary received as director of commerce and consumer affairs.

The responsibility for advocating the interests of the consumer of utility services shall be separate and distinct from the responsibilities of the public utilities commission and those assistants employed by the commission. As consumer advocate, the director of commerce and consumer affairs shall have full rights to participate as a party in interest in all proceedings before the public utilities commission.

ings results" on a county or divisional basis as mandated by the Commission's rules. After overruling the Advocate's motion for a finding of "insufficiency" and disposing of other preliminary matters, the Commission commenced a series of public hearings on Hawaiian Telephone's plea for rate increases.

The utility proposed across-the-board price increases amounting to approximately thirty-five percent for most of the services it rendered the public and limited changes in rates and charges for other services. The Consumer Advocate maintained throughout the contested-case hearing, as he had earlier, that a need for rate increases had not been demonstrated. The large sums Hawaiian Telephone became entitled to in the form of "transitional supplements" under the recently approved agreement with AT&T were among the reasons urged for disallowing rate hikes.

At one point in the protracted proceedings, the Company summarized its case through the testimony of an officer and the exhibits presented in conjunction therewith. It averred therein that "the rate relief requested [was] $47.6 million which will produce a rate of return on the intrastate rate base [of $485 million] of only 8.6%." (H.T.C. Exh. No. T-19, at 3-4). This estimate of necessary revenue, it explained, followed a determination "that a net operating income of $41.7 million would be required for intrastate operations in test year 1982." (H.T.C. Exh. No. T-19, at 4). "The Commission, based on the foregoing, [deemed] it [unnecessary] to make a finding on . . . a specific fair rate of return for the test year 1982." P.U.C. Decision and Order No. 7412, at 96. And it approved new rate schedules designed to "produce an annual revenue increase of $27,121,000" and yield the "net operating income of $41,700,000 . . . requested by HTC." *Id.* at 113. The disparity in estimates of additional revenue likely to generate the desired net income resulted in part from a finding that "[t]he intrastate rate base for test year 1982 [was] $454,129,000" rather than $485,000,000 as claimed by Hawaiian Telephone. *Id.*

II.

Hawaiian Telephone argues the Commission committed reversible error when it approved rate increases calculated to "produce an annual revenue increase of $27,121,000" and yield a "net

operating income of $41,700,000." The Commission, the Company claims, "adopted an unprecedented and unlawful method of determining the rate increase and then reduced the already inadequate award by the unsupported and unlawful use of a so-called 'Separation Adjustment.' " The initial specification of error is that "[t]he Commission erred in failing to find a fair rate of return." But we are not convinced this was error.

A.

We are mindful, of course, that orthodoxy in public utility rate making suggests four sequential determinations should precede the ultimate rate decision; they are:

(1) what are the enterprise's *gross utility revenues* under the rate structure examined; (2) what are its *operating expenses,* including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues; (3) what utility property provides the service for which rates are charged and thus represents the base *(rate base)* on which a return should be earned and (4) what percentage figure *(rate of return)* should be applied to the rate base in order to establish the *return* (wages of capital) to which investors in the utility enterprise are reasonably entitled.[9]

1 A. Priest, *Principles of Public Utility Regulation* 45 (1969) (emphasis in original).

The regulatory agency in this case acknowledged it did not determine "what percentage figure *(rate of return)* should be applied to the rate base in order to establish the *return." Id.* The public utility asserts the neglect was fatal. It maintains our decisions in *Honolulu Gas Co. v. Public Utilities Commission,* 33 Haw. 487 (1935), and *In re Hawaii Electric Light Co.,* 60 Haw. 625, 594 P.2d 612 (1979), "ma[k]e it abundantly clear that a fair rate of return finding is essential to the regulatory process," directing us to statements therein that seemingly support the thesis. Still, the enforce-

---

[9] 1 A. Priest, *supra,* note 1, at 45, reads as follows:

See Missouri *ex rel.* Southwestern Bell Tel. Co. v. Public Serv. Comm'n, 262 U.S. 276, 290-92 (1923) (Brandeis, J., dissenting). See also City of Cleveland v. Public Util. Comm'n, 164 Ohio St. 442, 132 N.E.2d 216, 217 (1956).

ment of text-book orthodoxy in the rate-making process is not our function under Hawaii Revised Statutes (HRS) Chapters 269 and 91; nor is it our practice to decide important questions of law by dicta from unrelated cases. *Cf. Permian Basin Area Rate Cases,* 390 U.S. 747, 775 (1968) (the Supreme "Court does not decide important questions of law by cursory dicta inserted in unrelated cases."), *reh'g denied,* 392 U.S. 917 (1968).

Our function in rate making is a limited one. "[T]he general supervision . . . over all public utilities" has been delegated to the Public Utilities Commission. HRS § 269-6 (Supp. 1983). "It is the Commission that is authorized to fix 'just and reasonable' rates to be charged by public utilities, HRS § 269-16 (1976), and a reviewing court is not empowered to examine the case *de novo.*" *In re Hawaii Electric Light Co.,* 60 Haw. at 629, 594 P.2d at 617 (citations omitted). Our role is circumscribed by the provisions of HRS § 91-14(g).[10] Section 91-14(g)(3), however, expressly provides that an administrative decision and order is subject to reversal or modification if "[m]ade upon unlawful procedure." Since the claim of error here concerns the procedure employed in approving revised rate schedules for utility services, our task is to consider the challenged action in the light of pertinent procedural mandates.

B.

The procedural requirements relating to rate determinations are delineated in HRS § 269-16(b). The subsection requires that

---

[10] HRS § 91-14(g) (1976) reads:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

changes in rate schedules be preceded by notice and commission approval.[11] And a rate increase can only be approved after "a public hearing" at which consumers or patrons of the utility are allowed

---

[11] In 1981 HRS § 269-16(b) read:

(b) No rate, fare, charge, classification, schedule, rule, or practice, other than one established pursuant to an automatic rate adjustment clause previously approved by the commission, shall be established, abandoned, modified, or departed from by any public utility, except after thirty days' notice to the commission and prior approval by the commission for any increases in rates, fares, or charges. The notice herein provided for shall plainly state the rate, fare, charge, classification, schedule, rule, or practice proposed to be established, abandoned, modified, or departed from and the proposed effective date thereof and shall be given by filing the notice with the commission and keeping it open for public inspection. The commission may, in its discretion and for good cause shown, allow any rate, fare, charge, classification, schedule, rule, or practice to be established, abandoned, modified, or departed from upon notice less than that provided for herein. A contested case hearing shall be held in connection with any increase in rates and such hearing shall be preceded by a public hearing at which the consumers or patrons of the public utility may present testimony to the commission concerning the increase. The public hearing shall be an advertised public hearing or hearings on the island on which the utility is situated. Notice of the advertised hearing, with the purpose thereof and the date, time, and place at which it will open, shall be advertised not less than once in each of three weeks in a newspaper published in and of general circulation in the State, the first publication being not less than twenty-one days before the public hearing and the last publication being not more than two days before the scheduled hearing. The applicant or applicants will notify their consumers or patrons of the proposed change in rates and of the time and place of the public hearing not less than one week before the date set, the manner and the fact of notification to be reported to the commission before the date of hearing. The commission is authorized to use such additional media as radio or television to advise the public if it finds it necessary to do so. The commission, upon notice to the public utility, may suspend the operation of all or any part of the proposed rate, fare, charge, classification, schedule, rule, or practice or any proposed abandonment or modification thereof or departure therefrom and after a hearing by order regulate, fix, and change all such rates, fares, charges, classifications, schedules, rules, and practices, so that the same shall be just and reasonable, and prohibit rebates and unreasonable discrimination between localities, or between users or consumers, under substantially similar conditions, regulate the manner in which the property of every public utility is operated with reference to the safety and accommodation of the public, prescribe its form and method of keeping accounts, books, and records, and its accounting system, regulate the return upon its public utility property, the incurring of indebtedness relating to its public utility business, and its financial transactions, and do all things in addition which are necessary and in the exercise of such power and jurisdiction, all of which as so ordered, regulated, fixed, and changed shall be just and reasonable, and such as shall provide a fair return on the property of the utility actually used or useful for public utility purposes.

Amendments to this subsection enacted in 1983 are not relevant to the instant case.

to present their views regarding the increase and "a contested case hearing." *See supra* note 11. Hawaiian Telephone does not dispute that the necessary "public hearing" and "contested case hearing" were conducted; nor does it contend the subsection expressly calls for a fair *rate* of return finding.

This aspect of the challenge of the rate order is purportedly grounded on the final portion of § 269-16(b), which "sums up the requirements of the entire ratemaking process" and dictates "just and reasonable" rates, "such as shall provide a fair return on the property . . . used or useful for public utility purposes." *See supra* note 11. Citing general principles of rate making, the Company argues a fair return determination can only follow a finding on a fair *rate* of return. And since no such finding preceded the decision on what the amount of the return would be, it would have us declare the rate order failed to meet the statutory standard enunciated in § 269-16(b).

Whether the rates set by the Commission are "just and reasonable," however, is by no means dependent on the procedure followed by the rate-making body in deciding what return would be fair in the circumstances. "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602 (1944) (citations omitted); *In re Hawaii Electric Light Co.,* 60 Haw. at 637, 594 P.2d at 621. As the Supreme Court explains:

> It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

*Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. at 602. Discerning no statutory basis for faulting the method employed by the Commission in determining the return the utility was entitled to, we proceed to the question of whether the rate order, in total effect, can be said to be unjust and unreasonable.

### III.

In Hawaiian Telephone's opinion the Commission failed "to provide . . . an opportunity [for the utility] to earn a fair return . . .

by arbitrarily limiting the rate award to a certain amount of net operating income" and also erred "in awarding a rate increase sufficient only to produce an annual revenue increase of $27,121,000 instead of the $47,600,000 requested." Essentially, the claim is that the rate increases were not "such as shall provide a fair return." *See supra* note 11.

A.

The Commission acknowledgedly tailored rate increases to produce less revenue than sought and to yield "a certain amount of net operating income." The resulting rate of return was 9.18% on the intrastate rate base rather than the 14.27% sought or the 11.3% and 12+% urged respectively by the Consumer Advocate and the Department of Defense, an intervenor in the proceeding.

"Rates which produce a return . . . more than 2% lower than the lowest rate of return [supported by an expert witness] in the case," Hawaiian Telephone contends, "clearly are unjust, unreasonable and confiscatory." Still, "the reasonableness of [utility] rates is not determined by a fixed formula but is a fact question requiring the exercise of sound discretion by the Commission." *In re Hawaii Electric Light Co.,* 60 Haw. at 636, 594 P.2d at 620 (citations omitted); *see also Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586 (1942). [12] Furthermore, "[i]t is . . . recognized that the ratemaking function involves the making of 'pragmatic' adjustments and . . . there is a 'zone of reasonableness' within which the [C]ommission may exercise its judgment." 60 Haw. at 636, 594 P.2d at 620 (citations omitted). Viewing the decision and order in context with these precepts in mind, we cannot say the Commission

---

[12] The Supreme Court's opinion in pertinent part reads:

The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end.

315 U.S. at 586.

arbitrarily limited the rate award or clearly erred in any other respect.

## B.

The rate award was obviously shaped to take account of uncommon circumstances. Admittedly it was influenced by significant events that anteceded the application for approval of rate increases, including assertions that "$130 million in transition payments [would] lessen the need for local rate increases." And revised rate schedules designed to provide the $41,700,000 in net operating income Hawaiian Telephone said would be required in test year 1982, rather·than those submitted earlier by the utility, were approved. To be sure, the Commission deviated from normal practice in several respects as alleged. Yet as we observed earlier, "[a]gencies to whom [the rate-making] power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular cir-· cumstances." *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. at 586; *see also In re Hawaii Electric Light Co.,* 60 Haw. at 636, 594 P.2d at 620.

The particular circumstances in the considered judgment of the rate-making agency called for practical adjustments to protect the public interest, and we perceive no grounds for a countermand of the ruling. Where approval by the FCC of a plan devised by AT&T and Hawaiian Telephone to postpone ordered rate reductions for interstate services and to provide $130,000,000 in "transitional supplements" for the latter over a four-year period was procured with the support of the State of Hawaii and such support was secured on a representation that telephone users in Hawaii would otherwise be subjected to "a local rate case generating $30-35 million per year,"[13] it would have been surprising if the Commission

---

[13] *See supra* notes 4, 5, and 6. That State support for the AT&T-Hawaiian Telephone agreement was secured on representations that it lessened the need for local rate increases is clear from the correspondence between officers of Hawaiian Telephone and the State of Hawaii. For example, the letter from L. K. Toole to the Attorney General was prefaced by this statement:

In the interest of reaching agreement between the State of Hawaii and Hawaiian Telephone for the State's support to the FCC of the ATT/HTC nego-

had not looked askance at a plea for approval of intrastate rate schedules calculated to produce $47,600,000 in additional revenue.

We detect no basis for deeming the rate order confiscatory. Though witnesses testifying at the contested case hearing thought a fair rate of return would be several percentage points above the 9.18% return the approved rates were likely to provide, we think 9.18% was within the 'zone of reasonableness.' *In re Hawaii Electric Light Co.*, 60 Haw. at 636, 594 P.2d at 620 (citations omitted). "[R]easonableness . . . is not determined by a fixed formula but is a fact question requiring the exercise of sound discretion . . . ." *Id.* When invoked as a guide, sound discretion is that "exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law." *Langnes v. Green*, 282 U.S. 531, 541 (1931) (quoted in *Cooke Trust Co. v. Edwards*, 43 Haw. 226, 231 (1959)).

Here, the Commission allowed rate increases calculated to yield the net operating income Hawaiian Telephone decided it needed. The resulting rate of return for the utility was higher than the 8.6% it said would be yielded by the revised rate schedules submitted for approval. And we have recounted some of the other factors considered by the Commission in approving rate schedules structured to produce a net operating income of $41,700,000. Under the circumstances, we could not say the Commission was arbitrary; we would have to agree the rate order was fashioned with regard to what appeared right and equitable under the circumstances and the law. In the words of the Commission, "[t]o insure that rates are 'just and reasonable' includes the power to take into consideration the interest of the ratepayers as well as that of the utility owners." P.U.C. Decision and Order No. 7412, at 27.

---

tiated Agreement in FCC Docket 21263, Hawaiian Telephone offers the following explanation of relevant factors.
*See* Letter from L. K. Toole to Tany Hong (October 15, 1980).

And the following statement appears in an earlier letter:
It is estimated that in the absence of the Agreement, a local rate case generating approximately $30-35 million per year or a 25-26% increase in rates to all local customers would be required to offset the effects of reduced toll revenues alone.
*See* letter from Donald M. Kuyper to the Hon. George R. Ariyoshi (August 13, 1980).

## IV.

The foregoing conclusion that the rate order was just and reasonable in total effect would normally end our inquiry. Hawaiian Telephone, however, avers the decision under review is flawed in yet another respect; it alleges the Commission erred "by making an unsupported and unlawful 'Separation Adjustment.'" We have examined the claim that the State agency invaded a federally preempted area by varying a jurisdictional separation approved by the FCC, but find the claim to be without merit.

### A.

Since the property of a telephone company is used in providing both intrastate and interstate telecommunications services and expenses are incurred in the joint rendition of such services, "a separation of telephone property, revenues, and expenses between the intrastate and interstate operations of the company ... 'is essential to the appropriate recognition of the competent governmental authority in each field of regulation.'" NARUC-FCC Separations Manual, *supra,* at 5 (quoting *Smith v. Illinois Bell Telephone Co.,* 282 U.S. 133, 148 (1930)). Hawaiian Telephone would have us rule the Commission intruded in an area reserved for federal regulation by adjusting the Company's intrastate rate base for the test year to reflect the consequences of its agreement with AT&T which deferred rate reductions on interstate telecommunications services and stipulated that its share of the revenue generated by furnishing such services during the test year would consist of a cost-based portion and a "transitional supplement."

The Commission, of course, may not interfere with federal regulation of interstate telecommunications services; the Supremacy Clause does not countenance rulings by a state rate-making agency that "may produce a result inconsistent with the objective of the federal [regulatory] statute." *Maryland v. Louisiana,* 451 U.S. 725, 747 (1981) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). Thus for example, a state agency may not adopt for its rate-making purposes a depreciation formula incompatible with the depreciation method decreed for such purposes by the FCC through a preemption order. *See New England Telephone &*

*Telegraph Co. v. Public Utilities Commission of Maine,* 570 F. Supp. 1558 (D.Me. 1983).

Here, the Commission neither varied a formula, method, or procedure decreed by the federal agency nor tampered with interstate rates in any way. It expressly rejected the Consumer Advocate's thesis that the circumstances surrounding the approval of "transitional supplements" by the FCC rendered it appropriate for those receipts to be considered as intrastate revenue, recognizing that "[t]he use of interstate revenues to satisfy intrastate revenue requirements would violate the fundamental principles of jurisdictional separations." P.U.C. Order and Decision No. 7412, at 22.

### B.

These precepts also impelled the Commission to take account of the federal prologue to the local rate case in fixing the intrastate rate base, for inequity could have been the result if the FCC's action and its effect on the apportionment of property, expenses, and revenue between jurisdictions were ignored. If each agency paid no heed to the action of the other in this area of mutual concern, a possible consequence could be that some costs of plant and expenses would not be included in the rate computations of either. In the situation above, the "carrier may be deprived of a fair rate of return when interstate and intrastate jurisdictions are both taken into account." *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 448 A.2d 272, 298 (Me. 1982). Conversely, where property and expenses are allocated to both jurisdictions or misallocated, the resulting rates may be unjust and unreasonable for the telephone user.

Confronted by what appeared to be a misallocation of property and expenses, the Commission decided the circumstances called for an adjustment of the intrastate rate base. It initially observed the rate base claimed by the Company in this proceeding had been derived from an application of the separations method embodied in the NARUC-FCC Separations Manual (the Ozark Plan). P.U.C. Decision and Order No. 7412, at 23. But for the crucial agreement sanctioned by the FCC, the rate base would have been computed in accord with the separations method employed in the preceding rate case, Hawaiian Plan II. *Id.* Had this been done "the intrastate

earnings under present rates," the Commission found, "would have been higher than that projected . . . [by applying] the Ozark formula." *Id.*[14] From this it deduced that in "overall effect [there was a] shifting of the expenses and plant from the interstate to intrastate operations *but* with no change in the relative use [of the plant] and no change in [the Company's] total operations." P.U.C. Decision and Order No. 7412, at 24 (emphasis in original).

It reasoned that if the order for rate integration and cost-based settlements in the federally regulated sector had been fully implemented, the Company's resort to the Ozark Plan in computing the rate base would have posed no problem. *Id.* But "[s]ince neither complete rate integration nor uniform cost based settlement will be achieved till January 1, 1985," the Commission concluded "the immediate application of the Ozark separations formula for allocating expenses and plant in this proceeding will certainly be inequitable for intrastate ratepayers." *Id.* Under these circumstances, we cannot say the Commission's adjustment of the rate base constituted clear error or arbitrary action.

" 'Rate base' represents the total investment in, or fair value of, the facilities of a utility employed in providing its service." 1 A. Priest, *supra,* at 139. "While the difficulty in making an exact apportionment [between jurisdictions] of the property [used in providing service] is apparent . . . [and] only reasonable measures [are] essen-

---

[14] The basis for this "finding" is stated by the Commission as follows:

The record also indicates that under Hawaiian Plan II, the intrastate rate of return under present rates would be 5.1% while under the Ozark Plan, the rate of return under present rates would be 4.0% as shown in Exhibit No. 1 attached hereto. Thus, by changing from Hawaiian Plan II to Ozark there are considerably more allocations of expenses and rate base items from the interstate to intrastate operation. The end result is that the intrastate rate of return under present rates is reduced by 1.1% from the conversion of Hawaiian Plan II to Ozark with virtually no change in total company expenses and expenditures on an overall basis. Also, there is no evidence to show that there is a change in the relative use and operations of HTC and the cardinal rule in separations formulas is that plant and expenses must be assigned on the basis of relative use — not on the basis of revenues. Even though the transitional supplement is deemed interstate revenues, the fact of the matter is that by switching to the Ozark separations plan, there was an adverse effect on the earnings of the intrastate operations. The overall effect is the shifting of the expenses and plant from the interstate to intrastate operations *but* with no change in the relative use and no change in HTC's total operations.

P.U.C. Decision and Order No. 7412, at 23-24 (emphasis in original).

tial . . . it is quite another matter to ignore altogether the actual uses to which the property is put." *Smith v. Illinois Bell Telephone Co.,* 282 U.S. at 150-51 (citations omitted). Thus, a jurisdictional separation may be premised on either "actual use" or "relative use." NARUC-FCC Separations Manual, *supra.* But in this case the acceptance of estimated rate bases for interstate and intrastate services derived from an application of the Ozark formula alone would have ignored altogether the use to which some property was ostensibly put to produce interstate revenue for Hawaiian Telephone, inasmuch as the revenue consisted of a portion fixed by the formula *plus* an additional sum of $32,650,000 for the test year.[15] We see no reason to disturb the pragmatic adjustment made by the Commission to reflect the relative use of Hawaiian Telephone's facilities.

The decision and order of the Public Utilities Commission is affirmed.

*Marshall M. Goodsill (Thomas W. Williams, Jr.,* with him on the briefs; *Goodsill, Anderson, Quinn & Stifel,* of counsel) for Appellant Hawaiian Telephone Co.

*Ronald Shigekane,* Deputy Attorney General, for Appellee Department of the Attorney General, Division of Consumer Advocacy, State of Hawaii.

---

[15] This was Hawaiian Telephone's estimate of the transitional supplement it would be entitled to for the test year 1982. *See* P.U.C. Decision and Order No. 7412, at 21.