827 F.2d 1264
 56 USLW 2173
 HAWAIIAN TELEPHONE COMPANY, a Hawaii Corporation, Plaintiff-Appellee,
v.
PUBLIC UTILITIES COMMISSION OF STATE OF HAWAII; Albert Tom,
Chairman; Sunai Kido, Commissioner; and Clyde S.
Dupont, Commissioner, Defendants,
Consumer Advocate, the Director of the Department of
Commerce and Consumer Affairs, State of Hawaii,
Intervenor-Defendant-Appellant.
 Nos. 85-1907, 85-1908.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 28, 1986.
Submission Deferred April 29, 1986.
Resubmitted Oct. 28, 1986.
Decided Sept. 11, 1987.
 
 L. Russell Mitten, II, Honolulu, Hawaii, William R. Malone, Washington, D.C., and Thomas W. Williams, Jr., Honolulu, Hawaii, for plaintiff-appellee.
 Ronald Shigekane, Honolulu, Hawaii, for the Consumer Advocate appellant.
 Harry S.Y. Kim, Honolulu, Hawaii, for appellants.
 Appeal from the United States District Court for the District of Hawaii.
 Before FERGUSON, CANBY and CYNTHIA HOLCOMB HALL, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 The ultimate issue in this case is whether the Hawaii Public Utilities Commission (PUC) violated an order of the Federal Communications Commission mandating use of a particular set of "separations" procedures for allocating the respective costs and investments between interstate and intrastate telephone operations. A threshold question is whether the district court had jurisdiction under Sec. 401(b) of the Communications Act to enforce the FCC order. In essence, the district court's permanent injunction required the PUC to obey the FCC order by raising Hawaiian Telephone Company's (HawTel's) intrastate rates by $10,507,000 annually.
 
 
 2
 Hawaii's PUC and Consumer Advocate, as intervenor, appealed. We deferred submission to await the Supreme Court's recent decision in Louisiana Public Service Commission v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), and to permit the parties to comment upon it. We now affirm the district court's injunction.
 
 BACKGROUND
 
 3
 HawTel provides interstate, intrastate, and overseas telephone service for residents of Hawaii. The FCC sets HawTel's long-distance rates, and the PUC sets intrastate rates. Because the same physical plant is used for both interstate and intrastate services, some system for apportioning costs and investments is necessary to set fair rates for the respective services. See generally MCI Telecommunications Corp. v. FCC, 750 F.2d 135 (D.C.Cir.1984); McKenna, Preemption Under the Communications Act, 37 Fed.Comm.L.J. 1 (1985). This system of apportionment is referred to as "separations procedures."
 
 
 4
 Until recently, interstate rates for telecommunications to and from Hawaii were considerably higher than interstate rates in the 48 contiguous states. In 1972, the FCC determined that Hawaii's rates should be integrated into the Mainland domestic rate pattern. Interstate rates in Hawaii accordingly were to be adjusted so that they would be roughly comparable to rates in other parts of the United States. In re Establishment of Domestic Communications-Satellite Facilities by Non-Governmental Entities, Second Report & Order (Docket No. 16495), 35 F.C.C.2d 844, 856-57, aff'd on reconsideration, 38 F.C.C.2d 665 (1972), aff'd sub nom. Network Project v. FCC, 511 F.2d 786 (D.C.Cir.1975). The FCC later decided that integration would be accomplished in part by establishing new procedures for interstate and intrastate cost apportionment. The FCC, exercising its authority under 47 U.S.C. Sec. 410, established a special Federal-State Joint Board, to advise it on fair separations procedures for Hawaii. The FCC had not previously prescribed any separations procedures for Hawaii, and the PUC had apportioned costs according to its own "Hawaiian Plan II."
 
 
 5
 In 1981, the Joint Board recommended use of the so-called "Ozark Plan," see 47 C.F.R. Secs. 67.1-67.701, for separations. In re Integration of Rates & Services for the Provision of Communications by Authorized Common Carriers between the United States Mainland & Hawaii & Alaska, Memorandum Opinion & Order (Docket 21263), 87 F.C.C.2d 20, 24 (1981). The Ozark Plan, which was developed through cooperative efforts of the FCC and utility regulators nationwide, had been used in the 48 states for some time. The Joint Board suggested extending the Plan for use in Hawaii without modification. Id. The FCC ordered application of the Ozark separations procedures to Hawaii. Integration of Rates & Services for the Provision of Communications by Authorized Common Carriers between the United States Mainland & Hawaii & Alaska, Report & Order 81-312 (Docket 21263), 87 F.C.C.2d 18 (1981) [hereafter Order 81-312].[1]
 
 
 6
 The new procedures were expected to yield significantly lower interstate phone rates, but only at the price of upward pressure on intrastate rates. To avoid a dramatic impact on local rates, the FCC, AT & T, and HawTel agreed to phase in the new procedures over four years, with full implementation by January 1, 1985. During the transition period, AT & T was to make certain payments or "transitional supplements" to HawTel, thereby reducing the need for immediate intrastate rate relief.
 
 
 7
 In August 1981, shortly after the integration plan was adopted in FCC Order 81-312, HawTel filed for a local rate increase of $47.6 million. PUC Docket 4306. This proceeding was a predecessor to the one that is the subject of this appeal. The PUC granted only $27.1 million of the requested increase, in part due to a downward 1.1 percent rate-of-return adjustment proposed by the PUC itself. The "Separation Adjustment" represented the difference between intrastate rates resulting from jurisdictional separations calculated under the Ozark Plan and those calculated under Hawaiian Plan II. In re Application of Hawaiian Telephone Company, PUC Decision & Order No. 7412, Docket No. 4306 (Jan.1983); see In re Application of Hawaiian Telephone Company, 67 Haw. 370, 689 P.2d 741, 751-52 (1984). The PUC agreed that the Ozark Plan should be used to establish the rate base, and that an 11.46 percent rate of return was appropriate. It also conceded that the transitional payments from AT & T must be treated as interstate revenues. It considered the special downward adjustment proper, however, in light of the State's previous support for the transitional rate-integration agreement between AT & T, HawTel, and the FCC. At HawTel's request, the State had lobbied the FCC for approval of the transition agreement, at least in part because of HawTel's representations that it would need local rate relief of $30-35 million per year if the agreement were not adopted.[2]
 
 
 8
 HawTel appealed the PUC's decision in Docket 4306 to the Hawaii Supreme Court, arguing that the order in fact nullified the FCC's 1981 mandate to employ the Ozark Plan. On September 27, 1984, the court upheld the PUC, finding that the PUC had employed appropriate procedures and that it merely had determined the appropriate rate of return on intrastate business, which was within its authority, Application of Hawaiian Telephone Company, 67 Haw. at 385, 689 P.2d at 751. HawTel declined to seek United States Supreme Court review.
 
 
 9
 While HawTel's state-court appeal was pending, it filed for another rate increase, with which this appeal is directly concerned. PUC Docket 4588. In Docket 4588, after determining that HawTel would be entitled under the Ozark Plan to some $30 million in new revenues, at a reasonable 11.25 percent rate of return, the PUC made an identical 1.1 percent rate-of-return adjustment. In re Application of Hawaiian Telephone Company. Decision & Order No. 8042, Docket No. 4588 (Aug. 1984). It granted HawTel about $20 million in rate relief, $10,507,000 less than its calculations indicated HawTel otherwise should receive. This time, however, the PUC did not expressly compare rates under the Ozark Plan to rates under Hawaiian Plan II, the way that it did to arrive at the 1.1 percent figure in 1981.
 
 
 10
 HawTel filed suit in federal district court under 47 U.S.C. Sec. 401(b),[3] challenging the PUC's second rate decision in Docket 4588. The downward rate adjustment, HawTel argued, constituted a failure of the PUC to obey FCC Order 81-312. Appellants PUC and Consumer Advocate argued that the district court lacked jurisdiction under Sec. 401(b) and that the PUC's intrastate rate decision was consistent with FCC Order 81-312. Further, appellants contended that HawTel's action was barred by the Johnson Act, 28 U.S.C. Sec. 1342,[4] and by the doctrine of res judicata. The district court rejected these contentions. Finding that the second 1.1 percent adjustment had the effect of applying Hawaiian Plan II as the basis for separations, the court issued preliminary and permanent injunctions. Hawaiian Telephone Company v. Public Utilities Commission, Civ. No. 84-1306, slip op. (D.Haw. Mar. 13, 1985). Both the PUC and the Consumer Advocate appeal.[5]
 
 DISCUSSION
 I. JURISDICTION UNDER 47 U.S.C. Sec. 401(b)
 
 11
 Questions of subject matter jurisdiction and statutory interpretation are reviewed in this court de novo. Carpenters Southern California Admin. Corp. v. Majestic Housing, 743 F.2d 1341, 1343 (9th Cir.1984); Southeast Alaska Conservation Council, Inc. v. Watson, 697 F.2d 1305, 1309 (9th Cir.1983).
 
 47 U.S.C. Sec. 401(b) states:
 
 12
 If any person fails or neglects to obey any order of the [FCC] other than for the payment of money, while the same is in effect, the [FCC] or any party injured thereby ... may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.
 
 
 13
 The threshold questions in this case are whether a state utility regulatory body is a "person" and whether, as a rulemaking or nonadjudicatory order, FCC Order 81-312 is an "order" "regularly made" within the meaning of Section 401(b).
 
 
 14
 A. Whether the PUC is a Person Within the Meaning of the Statute
 
 
 15
 The definitional section of the Communications Act, 47 U.S.C. Sec. 153, provides that: "[U]nless the context otherwise requires.... 'Person' includes an individual, partnership, association, joint-stock company, trust, or corporation." Id. Sec. 153(i). The Act defines "state commission" as "the commission, board, or official (by whatever name designated) which under the laws of any State has regulatory jurisdiction with respect to intrastate operations of carriers." Id. Sec. 153(t).
 
 
 16
 In support of their contention that the district court lacked subject matter jurisdiction to grant injunctive relief because the PUC is not a "person" for purposes of Sec. 401(b), appellants principally rely on the Vermont district court's decision in New England Telephone & Telegraph Company v. Public Service Board of Vermont, 576 F.Supp. 490 (D.Vt.1983), vacated as moot, 794 F.2d 677 (2d Cir.1984).[6] In that case, the district court held that because the definition of "person" in Sec. 153(i) includes a series of specific categories that do not encompass state utility commissions, the term "person" should not be interpreted to include such commissions. New England Tel. & Tel., 576 F.Supp. at 493-95.
 
 
 17
 We disagree with appellants' argument and the district court's analysis in New England Tel. & Tel. The design of the statute leads us to conclude that the PUC itself is a person for purposes of Sec. 401(b)[7]. Section 153(i) does not specify the meaning of "person" in the Communications Act, but instead lists several categories of entities that the term "includes."[8] Thus, the definition of "person" is open-ended and not restricted to the examples enumerated in the statute.[9] Furthermore, Sec. 153 expressly gives courts leeway to interpret terms in the Act "[as] the context ... requires." 47 U.S.C. Sec. 153.
 
 
 18
 The purposes of Sec. 401(b) and the structure of the Act strongly suggest that the PUC can be enjoined under Sec. 401(b).[10] Section 401(b) is the sole mechanism Congress provided for the FCC, the federal government, or private parties to obtain enforcement of FCC orders against noncarriers.[11] Under appellants' interpretation, state regulatory commissions would be exempt from this statutory scheme. Rather than being required to challenge FCC orders under Sec. 402,[12] state commissions would be free to violate FCC orders with impunity. They would be equally immune to private enforcement actions and to enforcement actions brought by the FCC and the federal government.
 
 
 19
 State commissions have the same opportunity as others to seek review of FCC orders under Sec. 402. See, e.g., State Corporation Commission v. FCC, 787 F.2d 1421 (10th Cir.1986); New York State Commission on Cable TV v. FCC, 669 F.2d 58, 62 n. 8 (2d Cir.1982); North Carolina Utilities Commission v. FCC, 552 F.2d 1036 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). No logical ground supports excluding state commissions from the group of persons against whom enforcement of orders may be sought. New England Telephone & Telegraph Company v. Public Utilities Commission, 570 F.Supp. 1558, 1569 (D.Me.1983), rev'd on other grounds, 742 F.2d 1 (1st Cir.1984), cert. denied, --- U.S. ----, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986). Moreover, since Sec. 401(a), which authorizes district courts to enjoin violations of the Act itself, also contains the term "person," state commissions would be immune from enforcement of the Act in general.[13] It is unlikely that Congress could have intended this result.
 
 
 20
 We hold that the PUC is a person for purposes of Sec. 401(b).[14] We also note that, even if the PUC does not itself constitute a person subject to a Sec. 401(b) enforcement action, the individual Commissioners clearly are "individuals" under Sec. 153(i).[15] Because the Commissioners qualify as persons for purposes of Sec. 401(b) injunctions, the district court would not lack subject matter jurisdiction even if the PUC were not a person.
 
 
 21
 B. Whether FCC Order 81-312 is an "Order" for Purposes of Sec. 401(b)
 
 
 22
 The next question is whether FCC Order 81-312 constitutes an "order of the Commission" within the meaning of Sec. 401(b).[16] Appellants maintain that it does not because the Order resulted from a rulemaking as opposed to an adjudicatory proceeding. The gist of appellants' argument has been accepted by the First Circuit. New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine, 742 F.2d 1 (1st Cir.1984), cert. denied, --- U.S. ----, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986) [hereafter New England Telephone v. Maine ]. In contrast, the Seventh Circuit has affirmed the grant of an injunction under Sec. 401(b) to enforce a nonadjudicatory order. Illinois Bell Telephone Company v. Illinois Commerce Commission, 740 F.2d 566, 571 (7th Cir.1984).
 
 
 23
 In New England Telephone v. Maine, the First Circuit based its decision primarily on two grounds. First, the court adopted the distinction between "rules" and "orders" that appears in the Administrative Procedure Act[17]. Second, it concluded that the central role of the FCC in enforcing the Communications Act, and its sole power to seek injunctions under Sec. 401(a), suggested that the scope for private enforcement under Sec. 401(b) should be narrow.[18] The court therefore concluded that an FCC directive that it considered to be the product of a rulemaking proceeding, and that was not specifically directed at the parties against whom enforcement was sought, was not enforceable under Sec. 401(b).
 
 
 24
 Like several other circuit courts,[19] we disagree with the First Circuit's reasoning. So did the FCC. See New England Telephone v. Maine, 742 F.2d at 10-11.
 
 
 25
 To begin with, we find no authority supporting the proposition that the APA's rule-order distinction should be imported into the Communications Act. See 5 U.S.C. Sec. 551 (use of APA's definitions is mandatory only when APA itself is applicable). In fact, the Communications Act's legislative history indicates that Sec. 401(b) was modeled in part after Sec. 16(12) of the Interstate Commerce Act, 49 U.S.C. Sec. 16(12) (repealed). The wording of the two provisions is virtually identical, see S.Rep. No. 781, 73d Cong., 2d Sess. 9 (1934). In Pacific Fruit Express Company v. Akron, Canton & Youngstown Railroad, 524 F.2d 1025, 1028-31 (9th Cir.1975), cert. denied, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976), we held that Sec. 16(12) authorizes private in junctive actions to enforce ICC rules. The same result would seem to follow for FCC rules under Sec. 401(b).
 
 
 26
 Second, the language of other sections of the Communications Act shows that Congress did not intend to limit Sec. 401(b) exclusively to adjudicatory orders as the APA defines them. When Congress intended the APA's definition of a given term to be incorporated into the Communications Act, it said so. E.g., 47 U.S.C. Secs. 409(a)-(c) (incorporating APA's definition of "adjudication"). Congress never provided that the APA's definition of "order" should extend to Sec. 401(b).[20]
 
 
 27
 We do not believe that our interpretation of Sec. 401(b) displaces the FCC from its central role in the enforcement of the Act. The FCC has broad discretion to act through either case-by-case adjudication or the rulemaking process. See United States v. Southwestern Cable Company, 392 U.S. 157, 180-81, 88 S.Ct. 1994, 2006-07, 20 L.Ed.2d 1001 (1968); see also SEC v. Chenery Corporation, 332 U.S. 194, 202-03, 67 S.Ct. 1575, 1580-81, 91 L.Ed. 1995 (1947) (citing CBS, Inc. v. United States, 316 U.S. 407, 421, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563 (1942)). Thus, the FCC can tailor directives to the needs of particular circumstances. Moreover, the FCC can intervene or file amicus briefs in Sec. 401(b) actions or even invoke the doctrine of primary jurisdiction. See, e.g., United States v. Yellow Freight System, Inc., 762 F.2d 737, 739 (9th Cir.1985) (primary jurisdiction doctrine authorizes suspension of district court proceedings to allow agency to express views on pending issues within agency's special competence); but see New England Telephone v. Maine, 742 F.2d at 11 (noting that primary jurisdiction doctrine lacks needed clarity and efficiency). These mechanisms help to prevent substantially inconsistent application of FCC rules and serious judicial encroachment on FCC responsibilities.
 
 
 28
 We need not decide today whether every rule, order, or regulation promulgated by the FCC is an enforceable order under Sec. 401(b), however. The language of the particular order in question, and the proceedings leading up to it, demonstrate that the FCC intended Order 81-312 to require particular actions be taken by the PUC and private carriers providing service to Hawaii.[21] Appellant PUC conceded that it must abide by those FCC-mandated separations procedures. Under the circumstances, we conclude that FCC Order 81-312 was appropriately interpreted as an "order" for enforcement by injunction in the district court.
 
 
 29
 C. Whether FCC Order 81-312 was "Regularly Made"
 
 
 30
 Appellants' final challenge to jurisdiction under Sec. 401(b) seizes upon that section's requirement that an order be "regularly made" by the FCC. They contend that a substantive determination must be made that the FCC had authority to make Order 81-312. Appellants argue that the Commission was without authority to mandate a specific separations method for intrastate ratemaking.
 
 
 31
 We think that "regularly made" in Sec. 401(b) simply refers to procedural regularity. The substantive validity of FCC orders can be challenged only through actions under Sec. 402(a). ITT World Communications, Inc., 466 U.S. at 468 & n. 5, 104 S.Ct. at 1939 & n. 5 (also noting in dicta that challenges to validity of past agency conduct should be brought through actions for FCC declaratory rulings under doctrine of primary jurisdiction, not in district courts). It would defeat the purpose of Sec. 402(a) to interpret Sec. 401(b) to require a threshold finding of the FCC's authority to make particular rules. Appellants identify, and we have found, no procedural problems with the promulgation of Order 81-312. Consequently, the district court had subject matter jurisdiction under Sec. 401(b) to issue the injunction.II. THE JOHNSON ACT
 
 
 32
 As their final jurisdictional challenge, appellants argue that the Johnson Act, 28 U.S.C. Sec. 1342, bars HawTel's action. The four conditions in the Johnson Act are conjunctive; therefore, all four conditions must be present to deprive the district court of jurisdiction.[22] DeKalb County v. Southern Bell Telephone & Telegraph Company, 358 F.Supp. 498, 504 (N.D.Ga.1972), aff'd, 478 F.2d 700 (5th Cir.1973); United States v. Public Utilities Commission, 141 F.Supp. 168, 188 (N.D.Cal.1956), aff'd, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958).
 
 
 33
 HawTel does not dispute that the final three conditions are met.[23] Instead, HawTel argues, and the district court found, that the Johnson Act is inapplicable because HawTel's action is not based "solely" on a claim of "repugnance of the order to the Federal Constitution." See 28 U.S.C. Sec. 1342(1). Although appellee's action is based expressly on 47 U.S.C. Sec. 401(b) and FCC Order 81-312, appellants contend that it is in essence a preemption claim under the Supremacy Clause.
 
 
 34
 We have construed the term "solely" in Sec. 1342(1) narrowly. The Johnson Act applies "only when [a challenge to a rate order] rests exclusively on 'repugnance of the order to the Federal Constitution.' " International Brotherhood of Electrical Workers v. Public Service Commission, 614 F.2d 206, 210-11 (9th Cir.1980) (quoting 28 U.S.C. Sec. 1342(1)) (emphasis supplied) (upholding federal jurisdiction because the union's action depended in part on an interpretation of National Labor Relations Act). A claim of preemption does not meet this test. Id. at 211. The district court was correct in holding that the Johnson Act did not bar appellee's action.
 
 III. RES JUDICATA
 
 35
 The district court also rejected appellants' contention that HawTel's claim is barred by res judicata. Appellants assert that HawTel argued that the PUC had misapplied FCC Order 81-312 when it appealed the PUC's 1981 rate order to the Hawaii Supreme Court.[24] Appellants contend that this issue is now foreclosed. Whether res judicata or collateral estoppel bars claims is a mixed question of law and fact subject to de novo review. A & A Concrete, Inc. v. White Mountain Apache Tribe, 781 F.2d 1411, 1414 (9th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 2008, 90 L.Ed.2d 659 (1986).
 
 
 36
 HawTel offers several responses. First, HawTel contends that the Hawaii Supreme Court never squarely addressed its federal claim,[25] at least in part because the court exercises only limited review of rate cases. See In re Application of Hawaii Electric Light Company, 60 Haw. 625, 628-29, 594 P.2d 612, 617 (1979). Thus, without citing the case, HawTel appears to invoke the principle of Robinson v. Ariyoshi, 753 F.2d 1468, 1472 (9th Cir.1985), vacated and remanded on other grounds, --- U.S. ----, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986), that collateral estoppel or res judicata effect will not be given to a state court decision when the complaining party did not have a "full and fair opportunity to litigate a claim in state court or where the state court demonstrated inability or unwillingness to protect federal rights." Id. There is some support in the record for HawTel's characterization of the Hawaii Supreme Court's decision, but we need not rule upon this contention because we find Hawtel's second argument dispositive.
 
 
 37
 HawTel's second point is that there is such a disparity between the contexts of the PUC decisions in Dockets 4306 and 4588 that neither res judicata nor collateral estoppel can apply. We agree. The two dockets involve different rate periods, with different rate bases. The causes of action are clearly not the same, and res judicata cannot apply. See Commissioner v. Sunnen, 333 U.S. 591, 597-98, 68 S.Ct. 715, 719-20, 92 L.Ed. 898 (1948) (income tax claims for successive tax years not same cause of action for res judicata purposes). It is true that collateral estoppel may apply and foreclose the litigation of issues that were actually litigated and decided in a previous action, even though the causes of action differ. Id. at 598-99, 68 S.Ct. at 719-20. But in successive rate proceedings, as in successive tax cases, there are strong policy reasons for denying the application of collateral estoppel when variations in either facts or law occur. An issue once decided may create inequities in the continuing administration of the law if applied by estoppel to later years. Id. at 599-600, 68 S.Ct. at 720-21.
 
 
 38
 Here we conclude that there were sufficient differences between the PUC actions in Dockets 4306 and 4588 to militate against the application of collateral estoppel to the 1.1 percent rate downward rate adjustment. Although essentially the same adjustment was applied, it was applied to different rate periods, with different revenues, different expenses, and different investments. See Papago Tribal Utility Authority v. FERC, 776 F.2d 828, 833 n. 5 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1515, 89 L.Ed.2d 913 (1986). When Docket 4306 was decided, HawTel was operating under its transition agreement with AT & T. Among other things, that agreement provided for payments to HawTel to soften the impact on its overall revenues of the mandated shift to the Ozark Plan. In contrast, Docket 4588 involved rates effective January 1, 1985, after the transition agreement had expired.[26] If, in this new setting, the 1.1 percent adjustment did violate the FCC separations rule, HawTel should be free to raise the issue, rather than to suffer a continuing violation of a policy set by the FCC. HawTel is not collaterally "appealing" the Hawaii Supreme Court's decision, but is challenging the lawfulness of the PUC's action in Docket 4588. PUC Docket 4588 has not been ruled upon by the Hawaii court, or any other court. We conclude that the district court properly rejected the application of res judicata and collateral estoppel.[27]
 
 IV. PREEMPTION OF THE SEPARATIONS FIELD
 
 39
 Reaching the merits, appellant Consumer Advocate contends that FCC Order 81-312 did not preempt state regulation of separations procedures and that the PUC's use of state-developed procedures was perfectly proper for intrastate ratemaking. This argument raises a question of law reviewed here de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 40
 Appellants concede the FCC's plenary authority over separations procedures, but argue in their Joint Brief that the FCC has not exercised this power. They point to the absence of an express statement of intention to preempt the field of separations for intrastate ratemaking purposes in FCC Order 81-312.[28] They argue that the applicable test for preemption is whether both the state and federal regulations "can be enforced without impairing the federal superintendence of the field." Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).
 
 
 41
 Appellants' argument overlooks the extent to which separations for interstate ratemaking and separations for intrastate ratemaking are two sides of the same coin.[29] When the same plant and equipment is used to provide both interstate and intrastate services and different authorities set rates for these respective services, cost and investment must be apportioned uniformly in order to establish fair rates. See The Minnesota Rate Cases, 230 U.S. 352, 435, 33 S.Ct. 729, 755, 57 L.Ed. 1511 (1913); Washington Utilities & Transportation Commission v. FCC, 513 F.2d 1142, 1146 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). If the sum of the intrastate and interstate portions for rate-base allocation purposes were not 100 percent,
 
 
 42
 some costs of plant and expenses would not be included in the rate computations of either [the PUC or the FCC]. In [that] situation ..., the "carrier may be deprived of a fair rate of return when interstate and intrastate jurisdictions are both taken into account."
 
 
 43
 Application of Hawaiian Tel. Co., 67 Haw. at 385-88, 689 P.2d at 751-52 (quoting New England Tel. & Tel. Co. v. Public Utilities Comm'n, 448 A.2d 272, 298 (Me.1982)). See also Illinois Bell, 740 F.2d at 567; Washington Utilities & Transportation Commission, 513 F.2d at 1146-47 (recognizing complementary nature of the separations process).
 
 
 44
 The Communications Act empowers the FCC to prescribe uniform separations procedures. Illinois Bell, 740 F.2d at 567; see 47 U.S.C. Sec. 221(c) (granting FCC authority to classify property for interstate or foreign telephone toll service); id. Sec. 410(c) (requiring use of Federal-State Joint Board for separations rulemaking). These statutes evince a congressional intent that FCC separations orders control the state regulatory bodies, because a nationwide telecommunications system with dual intrastate and interstate rates can operate effectively only if one set of separations procedures is employed. E.g., State Corporation Commission v. FCC, 787 F.2d 1421, 1426-27 (10th Cir.1986) (citing cases); see Louisiana Public Service, 106 S.Ct. at 1902 (citing Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930)); S.Rep. No. 92-362, 92d Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Admin.News 1511, 1513, 1515 (noting need to preserve federal superintendence in the separations field, citing Smith v. Illinois Bell, supra); see also NARUC v. FCC, 746 F.2d 1492, 1499-1501 (D.C.Cir.1984); In re Establishment of Interstate Toll Settlements & Jurisdictional Separations Requiring the Use of Seven Calendar Day Studies by the Florida Pub. Serv. Comm'n, Memorandum Opinion & Order on Reconsideration (Docket No. 84-268), 98 F.C.C.2d 777-84 (1984); In re AT & T & the Associated Bell System Companies Charges for Interstate & Foreign Communication Service, Interim Decision & Order (Docket Nos. 16258 & 15011), 9 F.C.C.2d 30, 90-91 (1967).
 
 
 45
 The FCC's statements during the lengthy Ozark Plan proceedings indicate a desire to adopt a separations scheme agreeable to as many states as possible because that scheme will apply to the entire nation. E.g., Prescription of Procedures for Separating and Allocating Plant Investment, Operating Expenses, Taxes and Reserves Between the Intrastate and Interstate Operations of Telephone Companies, Report & Order 70-1151 (Docket 18866), 26 F.C.C.2d 247, 257 (1970). In 1972, the FCC began efforts to integrate Hawaii "into the established rate scheme for communications services applicable to the Mainland." Docket No. 16495, 35 F.C.C.2d at 856-57. The FCC extended Ozark to Hawaii as a central part of that rate scheme in Order 81-312, expressly citing its separations authority under Sec. 221(c) and following the procedure set forth by Sec. 410(c).
 
 
 46
 This history, the statutory framework underlying it, and the need for consistent apportionment between interstate and intrastate operations, are sufficient to convince us that FCC Order 81-312 necessarily preempted any independent separations procedures of the Hawaii PUC.
 
 V. LOUISIANA PUBLIC SERVICE AND Sec. 152(b)
 
 47
 In its recent decision in Louisiana Public Service, the Supreme Court held that Sec. 152(b) of the Act bars "federal preemption of state regulation over depreciation of dual jurisdiction property for intrastate ratemaking purposes." 106 S.Ct. at 1904. Section 152(b) provides:
 
 
 48
 [N]othing in this chapter shall be construed to apply or to give the [FCC] jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier....
 
 
 49
 47 U.S.C. Sec. 152(b). Appellants argue that this provision, and the Louisiana Public Service decision, support their view that the FCC cannot dictate separations practices to the states for use in their intrastate ratemaking. We disagree.
 
 
 50
 The Supreme Court made it quite clear in Louisiana Public Service that federal separations procedures were an essential prerequisite to the creation of independent spheres of federal and state power over communications:
 
 
 51
 The Communications Act not only establishes dual state and federal regulation of telephone service; it also recognizes that jurisdictional tensions may arise as a result of the fact that interstate and intrastate service are provided by a single integrated system. Thus, the Act itself establishes a process designed to resolve what is [sic] known as "jurisdictional separations" matters, by which process it may be determined what portion of an asset is employed to produce or deliver interstate as opposed to intrastate service. 47 U.S.C. Sec. 410(c). Because the separations process literally separates costs such as taxes and operating expenses between interstate and intrastate service, it facilitates the creation or recognition of distinct spheres of regulation.
 
 
 52
 Louisiana Public Service, 106 S.Ct. at 1902. See also id. at 1899 ("the jurisdictional limitations placed on the FCC by Sec. 152(b), coupled with the fact that the Act provides for a 'separations' proceeding to determine the portions of a single asset that are used for interstate and intrastate service, 47 U.S.C. Sec. 410(c), answer" arguments for preemption of depreciation).
 
 
 53
 Thus, it is only after a uniform separations formula has been applied that a state's independent depreciation rule for intrastate ratemaking can be protected from federal preemption. See Smith v. Illinois Bell, 282 U.S. at 148, 51 S.Ct. at 68. The Supreme Court's decision in Louisiana Public Service accordingly supports our conclusion that the FCC separations procedures authorized by Sec. 410(c) of the Act bind the states, and that Sec. 152(b) does not stand in the way.[30]VI. PUC DISOBEDIENCE OF THE FCC ORDER
 
 
 54
 Finally, appellants contend that the PUC did not disobey the FCC order. The district court found that it did. We review factual findings for clear error. E.g., United States v. McConney, 728 F.2d at 1201.
 
 
 55
 We have already determined that the FCC properly preempted the separations field, employing the authority granted by the Communications Act. No one disputes the authority of a state PUC to establish a reasonable rate of return for utilities within its jurisdiction. But, as the district court found, the "appropriate adjustment" here was a fairly transparent and improper attempt to circumvent the FCC mandate. Cf. Aloha Airlines, Inc. v. Director of Taxation, 464 U.S. 7, 12-13, 104 S.Ct. 291, 294-95, 78 L.Ed.2d 10 (1983) (state could not circumvent preemptive federal Act prohibiting gross receipts tax on airlines by calling its tax a "property tax measured by gross receipts"). The Supremacy Clause does not countenance state policies--in this case, a state ratemaking ruling--that may produce results inconsistent with the objective of a federal statute. E.g., Maryland v. Louisiana, 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981).
 
 
 56
 The undisputed evidence is that, while the PUC initially used the Ozark Plan to calculate rates, it then adjusted rates downward by 1.1 percent. The PUC arrived at its 1.1 percent "Adjustment for Change in Separation Plan" by comparing 1981 rates under the Ozark Plan and under Hawaiian Plan II. It also took into account the transitional payments from AT & T even though it acknowledged that these had to be considered as interstate revenues. The district court did not clearly err in finding that this adjustment was an attempt to nullify the FCC's Ozark separations plan. Although no new comparison was performed in 1984 in Docket 4588, the PUC expressly carried over the 1.1 percent adjustment even after it found that 11.25 percent was a reasonable rate of return and that a rate increase of $30 million was necessary to achieve the 11.25 percent return.[31] Appellants offered only the explanation that the 1.1 percent adjustment resulted from the PUC's determination, within its proper authority, that the adjustment was "necessary, fair and reasonable." PUC Decision & Order No. 8042, Docket No. 4588 at 15 (noting that adjustment would be treated as an adjustment to expenses). No support for such a finding appears in the PUC order or in evidence, however.
 
 
 57
 Rather than simply accept the PUC's statements that it was applying the Ozark Plan, the district court properly considered the effect of the PUC's ruling to determine whether it conflicted with federal law. See Perez v. Campbell, 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971); New York State Commission on Cable TV v. FCC, 669 F.2d 58, 62 (2d Cir.1982). Reviewing the record, we conclude that the district court committed no clear error in finding that "[t]he so-called 'appropriate adjustment' ... in Docket No. 4588 was calculated solely and precisely on the difference between the Hawaiian Plan II and Ozark Separations formulas." Judgment for Permanent Injunction p 13. That finding supports a conclusion that PUC violated the FCC-imposed Ozark Plan.
 
 CONCLUSION
 
 58
 The district court's injunction is authorized under Sec. 401(b) and its decision to accord preemptive weight to FCC Order 81-312 does not violate the dual regulatory system prescribed under the Communications Act. The court did not clearly err in finding that the PUC's rate-of-return adjustment was in effect a thinly veiled attempt to depart from the required separation of plant and expenses between interstate and intrastate use. The PUC clearly has supreme authority with regard to intrastate ratemaking; but the PUC is not entitled to define boundaries of its intrastate sphere that are different from those established by the valid FCC order. Nor can the PUC accomplish by subterfuge what it could not, by its own admission, do directly.
 
 
 59
 The order of the district court enjoining the PUC and its Commissioners is therefore AFFIRMED.
 
 FERGUSON, Circuit Judge, dissenting:
 
 60
 I dissent. The majority opinion misconstrues and misapplies the Supreme Court's recent decision in Louisiana Public Service Commission v. FCC, 474 U.S. 1002, 106 S.Ct. 519, 88 L.Ed.2d 453 (1985), and in so doing pays scant heed to the important federalism concerns that lie at the heart of this case. As the Supreme Court has pointed out in a different context, "the essence of federalism is that States must be free to develop a variety of solutions to problems and not be forced into a common uniform mold." Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The Supremacy Clause of Art. VI of the Constitution does, of course, give Congress the power to preempt state law. See Louisiana, 106 S.Ct. at 1898. Absent a congressional mandate, however, it is not appropriate for either the FCC or this court to abridge the authority of the Hawaii Public Utilities Commission ("PUC") to set intrastate rates for telephone services. The Court's decision in Louisiana makes clear that 47 U.S.C. Sec. 152(b) constitutes a congressional denial of power to the FCC to regulate intrastate rate-making. For this reason, I would reverse the decision of the district court.
 
 
 61
 The threshold issue is, as the majority points out, the question of whether the district court had jurisdiction to require the PUC to obey an FCC order raising the intrastate rates for Hawaii Telephone ("HawTel"). Whether the district court had jurisdiction depends on whether there was an enforceable FCC order under 47 U.S.C. Sec. 401(b). Whether there was an enforceable order under section 401(b) depends, in turn, on whether intrastate rate-making is preempted by the uniform separations process.
 
 
 62
 It is undisputed that the Communications Act empowers the FCC to prescribe uniform separations procedures for apportioning the property and expenses of telephone companies between the interstate jurisdiction, governed by the FCC, and the intrastate jurisdiction, governed by state regulatory authorities. See 47 U.S.C. Secs. 221(c), 410(c). The issue, however, is whether, once that apportionment is made according to FCC procedures, the FCC can require the state to follow the uniform procedures when establishing intrastate rates. Simply stated, the question is whether state regulatory authorities are preempted by 47 U.S.C. Secs. 221(c) and 410(c) from making adjustments in setting intrastate rates. The Supreme Court's decision in Louisiana leaves no doubt that there is no federal preemption in the area of intrastate regulation, even where intrastate regulation has an impact on interstate communications. Under Louisiana, therefore, this court should find that the district court had no jurisdiction to enforce the FCC's order.
 
 
 63
 The issue in Louisiana was whether state regulation of depreciation methods and rates for telephone companies was preempted by rulings of the FCC. The Court held that 47 U.S.C. Sec. 152(b) bars federal preemption of state regulation of depreciation of "dual jurisdiction" property for intrastate rate-making purposes, notwithstanding 47 U.S.C. Sec. 220, which expressly directs the FCC to prescribe depreciation practices. The FCC argued in Louisiana that section 220 operates to preempt inconsistent state depreciation regulations even for intrastate rate-making purposes, and that such federal displacement of state regulation was justified as necessary to avoid frustration of valid federal policies. The Supreme Court rejected this argument, noting the "express jurisdictional limitations" of section 152(b) and stating that "by its terms this provision fences off from FCC reach or regulation intrastate matters--indeed including matters 'in connection with' intrastate service." 106 S.Ct. at 1899. The Court noted that the Act itself establishes a process for resolving jurisdictional separations issues, 47 U.S.C. Sec. 410(c), and stated that "it is possible to apply different rates and methods of depreciation to plant once the correct allocation between the interstate and intrastate use has been made." Id. at 1902.
 
 
 64
 Applying the reasoning of Louisiana, it is clear that once jurisdictional separations were made, the PUC was not preempted from making an adjustment to intrastate rates alone. Section 152(b) expressly denies the FCC jurisdiction over "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service." 106 S.Ct. at 1899. The Supreme Court noted that this section contains not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction ("... nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to ... intrastate communication service"). Thus, in Louisiana, the FCC could not rely on the specific grant of authority to prescribe depreciation procedures contained in section 220 to defeat the express limitations of section 152(b). Similarly, here, once apportionment between State and Federal jurisdictions is made under section 410(c), the FCC may not further rely on that section to invade the authority specifically denied the agency under section 152(b). As the Court points out, the separations process itself "facilitates the creation or recognition of distinct spheres of regulation." Id. at 1902.
 
 
 65
 Nor, under Louisiana, may the FCC compel a different result by arguing that the PUC's adjustment of intrastate rates was preempted as an evasion of the separations procedure. The Supreme Court makes clear in the Louisiana decision that arguments about the effect or impact of state regulation will not confer preemptive authority on the FCC if the agency is acting outside the scope of its congressionally delegated authority. In Louisiana, the FCC argued that the express limitations on federal authority contained in section 152(b) should not bar the FCC from requiring state commissions to follow FCC depreciation practices for intrastate ratemaking purposes, because the plant involved was used interchangeably to provide both intrastate and interstate service; and that any authority reserved to the states under section 152(b) should be confined to intrastate matters which are separable from and do not substantially affect interstate commerce.
 
 
 66
 The Supreme Court rejected this argument, noting:
 
 
 67
 While it is certainly true, and a basic underpinning of our federal system, that state regulation will be displaced to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, it is also true that a federal agency may preempt state law only when and if it is acting within the scope of its congressionally delegated authority.
 
 
 68
 Id. at 1901 (citation omitted).
 
 
 69
 The Court went on to explain that an agency literally has no power to act, let alone preempt state law, until Congress confers authority on it; and that the best way of determining whether Congress intended the agency's regulations to displace state law is to examine the scope of the authority granted to the agency by the legislature. Id. Applying these principles, the Court reiterated that section 152(b) constitutes a congressional denial of power to the FCC, and concluded therefore that "we simply cannot accept an argument that the FCC may nevertheless take action which it thinks will best effectuate a federal policy." Id.
 
 
 70
 The argument that HawTel made, and the district court accepted, that the Hawaii PUC's actions constituted an evasion of the federal separations procedures, is essentially the same kind of argument that the Court rejected in Louisiana. Louisiana stands for the proposition that an agency may not expand its jurisdiction beyond that granted by Congress, regardless of the policy arguments that the agency may make in support of greater preemptive power. Thus, under the principles of Louisiana the first question to ask is whether there is a congressional grant of authority to the agency. It is clear from the statute that Congress has authorized the FCC to establish separation procedures. However, error arises if it is concluded that this grant of authority extends to intrastate rate-making, as the authority of the FCC in this area is clearly limited by the express provisions of section 152(b). According to Louisiana, HawTel cannot bypass that express limitation by reference to the impact or effect of the state's exercise of authority on interstate communications. The Court explicitly holds that the authority reserved to the state regulatory authorities under section 152(b) is not limited to those areas where the matter to be regulated is "purely local" and where interstate communications are not affected by the state regulation. Dismissing this approach, the Court states "the short answer to this argument is that it misrepresents the statutory scheme and the basis and test for preemption." 106 S.Ct. at 1901.
 
 
 71
 I conclude therefore that the FCC order was not enforceable under 47 U.S.C. Sec. 401(b), as the federal agency had no authority to intervene in the purely intrastate rate-making of the PUC. The PUC accepted the FCC order in the initial separations process and allocated property and expenses between the intrastate and interstate jurisdictions accordingly. Once that process was complete, the authority of the FCC terminated, as, under section 152(b), the FCC may not require compliance with federal standards in intrastate ratemaking, arguments about the effect of such rate-making on interstate communications notwithstanding. Thus, the district court was without jurisdiction to issue the injunction.
 
 
 72
 To hold otherwise subverts the operation of the federalism that Congress has mandated. The FCC regulates interstate rates. The state PUCs regulate intrastate rates. That rule may not work as the telephone companies would like, but that is a problem that Congress must solve.[1] Only Congress can extend the jurisdiction of a federal agency, not the courts. Were proposals before Congress to confer jurisdiction on the FCC over intrastate rates, they would doubtless engender a considerable political controversy. However, Congress has not acted, and the Supreme Court has said in no uncertain terms that the FCC may not assume jurisdiction merely because it thinks to do so would make for a more efficient system.[2]
 
 
 73
 I have set forth in detail my reasons for dissenting from the majority's analysis of the impact of Louisiana because the majority ignores the important federalism concerns which must be addressed when federal regulatory agencies attempt to assert authority over intrastate decision-making absent a clear mandate from Congress. I believe, however, that this court does not need to reach the preemption issue as HawTel's suit here is collaterally estopped by the decision of the Hawaii Supreme Court in In re Hawaii Telephone Co., 689 P.2d 741 (Haw.1984).
 
 
 74
 The majority concludes that collateral estoppel does not apply because of the factual differences between the two actions. The majority concedes that both actions concerned HawTel's appeal of essentially the same downward adjustment in intrastate rates, but argues that because the adjustment was applied in different rate periods, with different revenues, different expenses, and different investments, the second suit is not a collateral appeal of the first.
 
 
 75
 The principle of collateral estoppel "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally." Commissioner v. Sunnen, 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). In the context of claims involving tax liability in different tax years, the Supreme Court noted that "the prior judgment acts as collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit," id. at 598, 68 S.Ct. at 720, cautioning that "a subsequent modification of the significant facts or a change in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes," id. at 599, 68 S.Ct. at 720.
 
 
 76
 The central issue in the instant case is whether the PUC may independently adjust its intrastate rate basis or is preempted from so doing by FCC orders governing the separations process. In Hawaiian Telephone Co., the Hawaii Supreme Court squarely confronted and decided this issue. The court stated: "We have examined the claim that the State agencies invaded a federally preempted area by varying a jurisdictional separation approved by the FCC, but find the claim to be without merit." 689 P.2d at 741. Thus, the two rate increase requests, one pursued in state court and one subsequently raised in federal court, raise the same legal issue: Did the PUC invade a federally preempted area in setting its intrastate rates? The state court found that it did not, because it neither "varied a formula, method of procedure decreed by the federal agency nor tampered with interstate rates in any way." Id. at 751.
 
 
 77
 In this suit, HawTel seeks to relitigate the propriety of that conclusion as to PUC's intrastate rate-making procedures. In the period between the first and second suit, there has been no "subsequent modification of the significant facts," Sunnen, 333 U.S. at 591, 68 S.Ct. at 715 (emphasis added). That the transition period had expired and that the two suits involved different rate periods are not significant changes for the determination of whether or not the state's authority to set intrastate rates, after following the prescribed separations procedures, is preempted under the federal statute. Collateral estoppel should therefore bar HawTel's attempt to relitigate in federal court the very issue decided against it by the Supreme Court of Hawaii. To decide otherwise is not only to commit the resources of this court to redundant litigation; it is also a contravention of those principles of comity which underlie the federal system.
 
 
 
 [1]
 See infra note 21
 
 
 [2]
 It appears that the PUC considered the rate request somewhat disingenuous under the circumstances. In particular, the PUC found that HawTel was already receiving rate relief through the transitional payments from AT & T. The PUC also stated that it ordered the 1.1 percent adjustment because it found that the shift from Hawaiian Plan II to Ozark resulted in a 1.1 percent reduction in the firm's intrastate returns, even though HawTel's overall revenues and expenses basically remained unchanged. The PUC therefore found the rate-of-return adjustment necessary to avoid a windfall for HawTel. PUC Decision & Order No. 7412 at 23-24
 
 
 [3]
 Section 401(b) is discussed at length infra Part I. HawTel also asserted subject matter jurisdiction in the district court under 28 U.S.C. Secs. 1331, 1337(a), 1343, 2201 & 2202. The court sustained jurisdiction under Sec. 401(b) and did not rule on the other grounds. Because we uphold the district court's ruling, we do not consider the other jurisdictional claims
 
 
 [4]
 28 U.S.C. Sec. 1342 provides:
 The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
 (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
 (2) The order does not interfere with interstate commerce; and,
 (3) The order has been made after reasonable notice and hearing; and,
 (4) A plain, speedy and efficient remedy may be had in the courts of such State.
 
 
 [5]
 The appeals were consolidated by our order of Aug. 20, 1985, and appellants filed a joint brief
 
 
 [6]
 New England Tel. & Tel. is listed as "REVERSED AND REMANDED" at 794 F.2d 677. The Second Circuit's memorandum decision makes clear, however, that it was vacated and ordered dismissed as moot
 
 
 [7]
 Section 401(b) was derived in part from Sec. 16 of the Interstate Commerce Act of 1887, 24 Stat. 379, 384 (1887), providing for judicial enforcement of ICC orders against "carriers." While the statute contemplated judicial orders addressed to carriers directing compliance with ICC orders, the statute also authorized injunctions addressed to any "other person" when necessary to secure carrier compliance. 24 Stat. at 385 (1887). Section 401(a) was derived from the 1906 amendment to Sec. 20 of the 1887 Act, 34 Stat. 584, 593-95 (1906), which also applied to "carriers." "Person" was substituted for "carrier" in the antecedents of both subsections, and the present language essentially appeared in the clean bill, S. 3285 (73d Cong., 2d Sess.) introduced by Senator Dill on April 4, 1934. 78 Cong.Rec. 5952 (1934)
 As part of the Procedural and Administrative Provisions, Sec. 401 is applicable to enforcement of all provisions of the chapter and orders thereunder.
 
 
 [8]
 In defining most of the terms in Sec. 153, Congress used the term "means." In defining "person," however, Congress chose to use the term "includes," as it did for only four other definitions in Sec. 153
 
 
 [9]
 See Highway & City Freight Drivers v. Gordon Transps., Inc., 576 F.2d 1285, 1289 (8th Cir.) (when statute describes what term "includes," "the fact that the statute does not specifically mention a particular entity ... does not imply that the entity falls outside of the definition") (citing Pfizer, Inc. v. India, 434 U.S. 308, 312 n. 9, 98 S.Ct. 584, 587 n. 9, 54 L.Ed.2d 563 (1978)), cert. denied, 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 678 (1978)
 
 
 [10]
 Several federal courts have held that state regulatory commissions are persons under Sec. 401(b). New England Tel. & Tel. Co. v. Public Util. Comm'n, 570 F.Supp. 1558, 1568-69 (D.Me.1983), rev'd on other grounds, 742 F.2d 1 (1st Cir.1984), cert. denied, --- U.S. ----, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986); Mountain States Tel. & Tel. Co. v. Department of Pub. Serv. Reg., 588 F.Supp. 5, 7 (D.Mont.1983); see also Illinois Bell Tel. Co. v. Illinois Commerce Comm'n, 740 F.2d 566 (7th Cir.1984); WUTC v. FCC, 513 F.2d 1142, 1145-46, 1152 (9th Cir.) (holding state commission had standing to challenge validity of FCC order under Sec. 402(a), implicitly concluding that WUTC was a "person who is aggrieved or whose interests are adversely affected" under Sec. 402(b)(6)), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975)
 
 
 [11]
 Civil actions for enforcement and review of the Communications Act and orders made under the Act are governed by 47 U.S.C. Secs. 401-415. Following promulgation of an order by the FCC, any aggrieved party can petition for rehearing. Id. Sec. 405. Sections 401(a) & (c) permit the FCC to prosecute violations of the chapter
 
 
 [12]
 Parties seeking to challenge the validity of FCC orders must do so through actions in the circuit courts under 47 U.S.C. Sec. 402 and 28 U.S.C. Sec. 2342(1). FCC v. ITT World Communications, Inc., 466 U.S. 463, 468, 104 S.Ct. 1936, 1939, 80 L.Ed.2d 480 (1984)
 
 
 [13]
 Section 401(a), 47 U.S.C. Sec. 401(a), provides in part:
 (a) The district courts of the United States shall have jurisdiction, upon application of the Attorney General of the United States at the request of the Commission, alleging a failure to comply with or a violation of any of the provisions of this chapter by any person, to issue a writ or writs of mandamus commanding such person to comply with the provisions of this chapter.
 Id. (emphasis supplied).
 
 
 [14]
 Appellants also claim that holding the PUC to be a person under Sec. 401(b) derogates the express provisions of Sec. 152(b). The effect of Sec. 152(b) is addressed in connection with our preemption analysis, infra
 
 
 [15]
 HawTel's complaint named the individual Commissioners as defendants, along with the PUC. The district court permanently enjoined both the Commissioners individually and the PUC
 
 
 [16]
 The phrase "order of the Commission" is not defined in the Communications Act
 
 
 [17]
 The APA defines the term "order" as "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." 5 U.S.C. Sec. 551(6)
 The First Circuit also cited Congress' use of the term "order" in several other provisions of the Communications Act, which it interpreted to signify only FCC adjudicatory orders and not FCC rules. New England Telephone v. Maine, 742 F.2d at 7 (citing 47 U.S.C. Secs. 201, 204, 205, 209, 214(d) & 416(a)).
 
 
 [18]
 The First Circuit further noted that treating FCC rules as orders under Sec. 401(b) would require district judges with no special expertise regarding FCC rules to determine in the first instance the scope and meaning of those rules. Allowing 700 different judges to make such determinations would lead to inconsistent interpretations of the FCC rules and threaten "the sound development of a coherent nationwide communications policy," which was "a central objective of the 1934 Act." New England Telephone v. Maine, 742 F.2d at 5-6
 The First Circuit was also concerned about allowing injunctions against parties who were not involved in the proceeding in which a rule was promulgated. See id. at 6-7.
 
 
 [19]
 For substantially the same reasons discussed infra, the Fourth, Fifth, and Eighth Circuits, as well as the federal court for the District of Washington, have expressly or implicitly rejected the analysis of New England Telephone v. Maine in a series of decisions that have been vacated and remanded or reversed on other grounds. Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n, 748 F.2d 879, 880-81 (4th Cir.1984), vacated and remanded for proceedings consistent with Louisiana Pub. Serv. Comm'n v. FCC, infra, 476 U.S. 445, 106 S.Ct. 2239, 90 L.Ed.2d 444 (1986) (per curiam) (mem.); South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n, 744 F.2d 1107, 1115 (5th Cir.1984), vacated and remanded for consideration in light of Chesapeake & Potomac, supra, --- U.S. ----, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986) (mem.); Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n, 738 F.2d 901 (8th Cir.1984), vacated and remanded for consideration in light of Chesapeake & Potomac, supra, --- U.S. ----, 106 S.Ct. 2885, 90 L.Ed.2d 973 (1986) (mem.); Virginia State Corp. Comm'n v. FCC, 737 F.2d 388 (4th Cir.1984), rev'd on other grounds sub nom. Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); Pacific Northwest Bell Tel. v. Washington Util. & Transp. Comm'n, 565 F.Supp. 17, 21 (D.Wa.1983), vacated and remanded in light of Louisiana Pub. Serv. Comm'n, supra, 827 F.2d 1242 (9th Cir.1986)
 The First Circuit's result also conflicts with the Seventh Circuit's decision in Illinois Bell Tel. Co., 740 F.2d 566 (ordering state commission compliance with FCC order relating to Separations Procedures), and the injunction granted by the federal court for the District of Kansas in Southwestern Bell Tel. Co. v. State Corp. Comm'n, No. 83-4090 (D.Kan. Apr. 8, 1983).
 
 
 [20]
 Two Supreme Court decisions also seem to support the conclusion that Congress intended the term "order" in Sec. 401(b) to encompass FCC rules. In CBS, Inc. v. United States, 316 U.S. 407, 425, 62 S.Ct. 1194, 1204, 86 L.Ed. 1563 (1942), the Court held that FCC rules constitute orders for purposes of Sec. 402(a) of the Act. Because Congress did not indicate any intention that "order" should have a different meaning in Sec. 401(b) from Sec. 402, it appears that FCC rules can be construed to constitute orders for purposes of Sec. 401(b). But see New England Telephone v. Maine, 742 F.2d at 8 (distinct functions of sections 401(b) and 402 dictate a far broader interpretation of "order" in Sec. 402 than in Sec. 401(b))
 In Ambassador, Inc. v. United States, 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945), the Supreme Court upheld a Sec. 401 injunction granted to enforce tariff regulations imposed by a telephone company in compliance with a FCC rulemaking order. Id. at 325, 65 S.Ct. at 1155. To the extent that Ambassador involved a Sec. 401(b) injunction, it also supports the injunction in this case.
 
 
 [21]
 See FCC Order 81-312, 87 F.C.C.2d 18, which in pertinent part provides:
 
 
 [3]
 IT IS FURTHER ORDERED That ... the NARUC-FCC Separations Manual [Ozark Plan] ... SHALL APPLY to Hawaii and Alaska
 
 
 [4]
 IT IS FURTHER ORDERED That, Section 67.1(e) of the Commission's Rules and Regulations, 47 C.F.R. Sec. 67.1(e), IS AMENDED to read as follows: These Separations Procedures apply to Puerto Rico, the United States Virgin Islands, Alaska and Hawaii
 Thus, the order was not merely interpretive, but instead was a mandate to apply the NARUC-FCC separations procedure.
 
 
 [22]
 See supra note 4
 
 
 [23]
 The PUC's decision possibly may affect interstate commerce, see 28 U.S.C. Sec. 1342(2), because it interferes with an FCC-mandated system for apportioning costs between interstate and intrastate services. HawTel does not advance this argument, and we need not consider it today
 
 
 [24]
 To the extent HawTel did not assert that argument, appellants contend it should have and is now precluded from doing so. Appellants appear to argue at times that res judicata bars HawTel's district court action. At other times, they appear to argue that HawTel should be collaterally estopped from raising certain issues. Our conclusion is the same whichever doctrine appellants intend to argue
 
 
 [25]
 Res judicata prevents federal litigation of a federal constitutional claim that was or might have been raised in a prior state action. Board of Trustees of Carpenters Pension Trust Fund v. Reyes, 688 F.2d 671, 673 (9th Cir.1982) (noting appellant's failure to seek United States Supreme Court review of the state court judgment), cert. denied, 462 U.S. 1120, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983)
 
 
 [26]
 In its Judgment for Permanent Injunction p 15, the district court noted this distinction:
 The declared purpose behind the PUC adjustment is to have Hawaii intrastate ratepayers share in the transitional supplement received by HTC under the HTC-AT & T agreement approved by the FCC in 1981. Yet presumably Hawaii intrastate ratepayers have received some benefit from that agreement by a slowing down of increases in intrastate rates. Furthermore, that agreement, and supplements under the agreement, terminated on December 31, 1984. The rates set in PUC Docket No. 4588, however, remain in place indefinitely until modified in another future proceeding before the PUC.
 Id.
 
 
 [27]
 HawTel also argued that because federal courts have exclusive jurisdiction under Sec. 401(b) to enforce FCC Orders, the state court determination cannot preclude federal review even if the state court reached the merits of its federal claim. See Southern Pacific Transp. Co. v. Public Utilities Comm'n, 716 F.2d 1285, 1289-90 (9th Cir.1983), cert. denied, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). We need not reach this issue, and express no view on the merits of appellees' contentions regarding exclusive jurisdiction, or on that possible ground for collateral attack on the state court's decision
 
 
 [28]
 In this respect, appellants' brief contradicts the PUC's earlier concessions in Docket 4588 and in the Hearing on Motion for Preliminary Injunction, that the PUC must apply the FCC-mandated separations procedures. Counsel for the PUC stated that the PUC agreed with Hawtel and "the FCC that the separations formula must remain intact for each governmental authority to assert its own jurisdiction."
 
 
 [29]
 Thus the question is not whether federal separations procedures preempt state ratemaking. It is whether federal separations procedures preempt any inconsistent separations adopted, openly or otherwise, by the state for the purposes of establishing the intrastate rate base
 
 
 [30]
 Appellants contend that, even after imposition of a federal separations formula, PUC remains free to impose variations. If, for example, the FCC decides that interstate rates should be based on 25% of an employee's $20 per hour wage, the PUC need not accept a base of the remaining $15. The PUC remains free to determine that a $20 wage is unreasonable for state ratemaking purposes, while a $16 wage is reasonable. The PUC could then base its rates on 75% of that figure, or $12
 We accept this argument, but it does not apply directly to this case. What the PUC cannot do is concede that a $20 wage is reasonable for intrastate ratemaking purposes, but nevertheless base its rate on $12 of the wage because it thought that the interstate proportion of the wage, set by the FCC at 25%, was too low. That example is more nearly analogous to this case.
 
 
 [31]
 The PUC made it quite clear that its adjustment in Docket No. 4588 was not independent of its original adjustment in Docket No. 4306. "We find no reason to deviate from our previous decision." Decision & Order No. 8042, Docket No. 4588, at 14
 
 
 [1]
 It is hard to escape the conclusion that, as in Louisiana, "what is really troubling [the appellees] is their sense that state regulations will not allow them sufficient revenues." 106 S.Ct. at 1902. While recognizing that concern, as the Court pointed out, "only Congress can rewrite the statute." Id
 
 
 [2]
 It should be emphasized that a decision by this panel that there was no enforceable order under 47 U.S.C. Sec. 401(b) would not leave the telephone companies without any means of challenging the rate-setting of state rate-setting commissions. Apart from any federal constitutional claims, there are also a number of state grounds on which decisions or orders of state regulatory agencies may be challenged in state courts. See, e.g., Haw.Rev.Stat. Sec. 91-14(g) (1976)